GEORGE GORHAM, as Executor, etc., Respondent *v.* MILLARD P. FILLMORE, Appellant.

In an ante-nuptial agreement, both the parties to which were persons of large means, after clear and definite provisions had been made as to the interest each should take in the property of the other during life and after the death of the other, was contained the following clause: "All the furniture, plate, horses, carriages and other personal property *in use by the parties for family purposes,* at the time of the death of either, shall vest absolutely in the survivor." The parties intermarried, and F., the husband, died first. In an action by the executor of the wife to recover certain personal property, the title to which he claimed became vested in the wife, *held,* that the clause included such property as they both had been accustomed to use in their domestic life, and whose continued enjoyment was essential to the personal comfort and convenience of those habituated to its daily use; that it did not include property not so in use, or such as was employed for the use and enjoyment of the respective parties individually; nor did it include heir-looms, valuable mainly because of their relation to and association with the family of one of the parties, by whose members it had been acquired.

Among the property claimed by plaintiff was a large and very valuable library owned by F. at his decease, the collection of which had occupied his lifetime. He had held the office of President of the United States, and, during his incumbency of that office, large additions to the library were made, more or less associated with the office. *Held,* that the library did not pass to the wife under the clause in question.

F. owned a quantity of silverware, which had been kept in a box in a safe, and which was marked with his initials and those of other members of his

family, and other silverware purchaséd by his first wife with the pro-
ceeds of a present made to her while she occupied the presidential
mansion, none of which had been in ordinary use, but were kept in
store by themselves. On one or two occasions of public receptions a few
of the pieces of plate had been used to decorate the tables and rooms.
*Held,* that this silverware was not included in the contract.

So, also, *held,* as to a quantity of wines acquired by F. while he was
president, none of which, so far as appeared, had ever been used for
family purposes.

So, also, *held,* as to trunks bought and used by F. individually, and other
personal property ,which had, for a long time, been excluded from the
house and had not been in use.

(Argued October 8, 1888; decided November 27, 1888.)

APPEAL from judgment of the General Term of the Supreme
Court in the fifth judicial department, entered upon an order
made October 22, 1886, which affirmed a judgment in favor
of plaintiff, entered upon the report of a referee.

This action was brought by plaintiff, as executor of Caroline
C. Fillmore, deceased, to recover possession of a quantity of
personal property owned by Millard Fillmore, the former
husband of the testatrix, at the time of his decease.

The property in question consisted principally of the library
of the said Fillmore, maps and rack, a quantity of silverware,
kept in a white tin box in a safe, a quantity of wine, and a
number of trunks

The facts, so far as material, are stated in the opinion.

*H. C. Day* for appellant. Ante-nuptial contracts, intended
to regulate the interest which each of the parties to the marriage
shall take in the property of the other during coverture or after
death, are favored by the courts. (*Johnston* v. *Spicer* 107
N. Y. 185; *Throop Grain Cleaning Co.* v. *Smith,* 16 N. Y.
S. R. 821, 833.) The plaintiff, in order to establish his title
to the property in question, under the provisions of the sixth
clause of the ante-nuptial contract, was.bound to show that
the same was "in use by the parties for family purposes at
the time of the death of Mr. Fillmore. (*Sheldon* v. *Sheldon,*
51 N. Y. 354; *Wedgman* v. *Childs,* 41 id. 159; *Matthews* v.
*Coe,* 49 id. 57; *S. C.,* 70 id. 239, 246; *Sickels* v. *Flanagan,*
79 id. 224.)

*Spencer Clinton* for respondent. The silver marked with the initials of Mr. Fillmore's first wife and of his daughter was his property at the time of his marriage with the testatrix without administration. (*Vallance* v. *Bausch,* 28 Barb. 633; *Burke* v., *Valentine,* 52 id. 412; *Watson* v. *Bonny,* 2 Sandf. 405.) As to all the other property, a fair construction of the marriage settlement requires that it should be held to have become Mrs. Fillmore's upon Mr. Fillmore's death. (*Pierce* v. *Pierce,* 71 N. Y. 154.) Marriage articles are considered as the heads or minutes, only, of an agreement entered into between the parties upon valuable consideration (the marriage), and being in their nature executory, ought to be construed and molded in equity according to the intention of the parties at the time of making them. (*Tabb* v. *Archer,* 3 H. & M. [Va.] 399; *McGuire* v. *Scully,* 1 McM. [S. C.] 378; *Horry* v. *Horry,* 2 Desaussure [S. C.] 125; *Wilcox* v. *Hubard,* 4 Mum. [Va.] 346; *Dayton* v. *Tillon,* 1 Robt. 21.)

RUGER, Ch. J. The controversy in this case involves the construction of the sixth clause of a contract made between Millard Fillmore and Mrs. Caroline C. McIntosh, on December 21, 1857, in anticipation of their marriage, which took place shortly thereafter. The clause is as follows:

"*Sixthly.* All the furniture, plate, horses, carriages and other personal property *in use by the parties for family purposes,* at the time of the death of either, shall vest absolutely in the survivor, without inventory or liability to account therefor in any way."

The evidence in the case is wholly undisputed, and the question to be determined is one purely of law, arising upon the construction of the agreement. It appears, by the evidence, that at the time of its execution Mr. Fillmore was a resident of Buffalo; a gentleman of wealth, leisure and culture, having occupied the highest civil station attainable in this country by a citizen, and having retired therefrom a few years before, with the respect and esteem of his fellow-countrymen. Mrs. McIntosh resided at Albany, of which

·city she had long been a resident, and had occupied a high position in its social circles, being a lady of culture and refinement, possessed of ample means and leading a life of elegant leisure and enjoyment. The contract was drawn by distinguished lawyers, the mutual friends of both parties; Judge Nathan K. Hall acting on behalf of Mr. Fillmore, and Senator Ira Harris for Mrs. McIntosh. After the marriage the parties took up their abode in the mansion owned by Mr. Fillmore on Delaware avenue, in the city of Buffalo, and they resided there together until the death of Mr. Fillmore in 1874, after which time Mrs. Fillmore continued to reside there until her death in 1881.

It does not appear that either of the parties had any living descendants or near relatives other than the defendant, who was the son of Mr. Fillmore, and who became and continued a member of the family from the time of the marriage down to the death of Mrs. Fillmore. The defendant was appointed executor and Mrs. Fillmore executrix of the will of Millard Fillmore, and the property in dispute in this action, remained in the family residence until Mrs. Fillmore's death, unappropriated and undisposed of by either party. No controversy arose between Mrs. Fillmore and her son for the several years during which they used this property in common; but, after her death, its exclusive possession was claimed by the plaintiff, as her executor, under the clause of the contract hereinbefore quoted, and this action was brought to recover its possession. The decisions of the courts below have favored the claim of the executor, and this appeal has been taken to review their determination.

It is not probable that such a controversy would have arisen if the tastes and desires of the parties to the contract could have been consulted; but the executor, feeling constrained by a supposed legal obligation resting upon him, has brought this action in an amicable spirit to settle judicially the title to the property. It will doubtless be as gratifying to the feelings of the plaintiff as to other friends of the parties, if it shall be found to be in accordance with the law, that the disposition

of this property, may be. made to accord with what must instinctively be felt by all persons acquainted with the circumstances, to have been the wish and desire of the contracting parties. The question is not wholly free from doubt; but following the rule which obtains in the construction of all contracts, viz., that the intentions of the parties must control, we can reach a conclusion which seems to us to be reasonably satisfactory.

This contract must be regarded as one drawn with great care, with a full understanding of the precise meaning of the language employed, and an intention that each word and sentence shall have its appropriate influence and effect upon the construction of the instrument. It will thus be seen that following the general words containing a description of the property covered by the clause, there occur expressions intended to effect a limitation of their meaning, and confining it to such property as is used in a particular manner. We do not think that the courts below have given that effect to the words of this limitation which they are justly entitled to, considering the obvious intention with which they were employed. They were evidently used to exclude from the operation of the agreement all such property as was employed for the use and enjoyment of the respective parties individually, as well as that not in use for family purposes; and, we think, that class of property also in the nature of heir looms, which is rendered valuable mainly because of its relations to, and associations with the family by whose members it was acquired, and to whom it naturally belongs. It can hardly be supposed that Mr. Fillmore intended that any articles of property which came to him as incidents of the high office he had filled, and which would be desirable to his family as evidences and mementoes of the distinction enjoyed by him, should be taken from them upon his death, and conferred upon strangers to his blood. Neither, we think, can it be supposed that a valuable gallery of paintings, such as that possessed by Mrs. McIntosh at the time of her marriage, and subsequently used to adorn the walls of the family residence,

could have been intended to pass under the general designation of furniture or other "personal property," as used in this contract. We are also quite unable to suppose that the parties to the contract were, when drafting the clause in question, induced by mercenary considerations or made nice calculations with a view of balancing the pecuniary benefits to be derived by them respectively therefrom, or weighed with scrupulous exactness the financial possibilities of the contemplated marriage.

It is significant of the intention of the parties that the prior clauses of the contract had determined clearly and definitely the interest which the respective parties should take in the property of the other, not only during their lifetime, but upon the death of either, and the clause in question was the last provision of the contract and was apparently of minor importance, introduced for the purpose of securing the comfort and convenience of the survivor of the marriage.

We think a reasonable and fair construction of the contract leads to the conclusion that this clause was inserted for the purpose of providing for the continued use and enjoyment by the survivor, of the family property, which they had both been accustomed to use in their domestic life, and the continued enjoyment of which was essential to the personal comfort and convenience of those who had been habituated to its daily use. No other construction is consistent with our idea of the high character, distinguished position and refined tastes of the parties to the agreement Such property was intended to pass as was "in use by the parties for family purposes," and no other.

The question presented is widely different from that which would have arisen had the words of limitation been omitted. We have been referred to no case which seems to us to be in point upon the question involved here, and the case must, therefore, be decided by the construction to be given to the peculiar language of the particular contract, and the inferences which we are able to draw therefrom as to the intention of

the parties, in view of their situation and condition in life and the circumstances surrounding them.

The main subject of contention between the parties is the library of Mr. Fillmore, the collection of which had occupied his whole lifetime, and to which, we may reasonably suppose, large additions were made during his incumbency of the office of president, and which were more or less associated with that distinction. This property would seem to have been under the consideration of the counsel who drew the contract, as it was much the most valuable possession of Mr. Fillmore's as connected with his residence, and it seems strange that horses, carriages and furniture should be specially mentioned, while this more important item should be left to the uncertain description of general words, if it was intended to be included therein. Neither paintings, books or a library are mentioned, and we cannot believe that the eminent lawyers who drew this contract would have omitted to describe them, or have left it a matter of doubt, if they had supposed such property was to be included in the provisions of this clause. The bulk of the books, which would naturally have been collected by such a man as Mr. Fillmore, would probably have little in them to attract the notice or attention of a lady, and it may well be inferred that their acquisition by her would not be especially coveted, while to the relatives of his own blood their possession would naturally be an object of pride and satisfaction. It is not reasonable, we think, to suppose that Mr. Fillmore contemplated a disposition of this property upon the death of himself and Mrs. Fillmore, which would take it away from his immediate family and descendants, and confer it upon those who were not of kin to him, whose name would not recall his reputation, and who were not interested in its perpetuation. Such a construction is not necessary to satisfy the language of this contract, and, we think, it cannot be given to it without violating the intention of the parties.

We also think that the silverware contained in the white tin box, and that purchased by the first wife of Mr. Fillmore

with the proceeds of a present made to her by ladies of New York while she occupied the presidential mansion, were not covered by the language of the contract. The evidence is undisputed that these articles were not in use for family purposes, but were kept in store by themselves, marked with the initials of Mr. Fillmore and other members of the family, and although occasionally examined, were not employed for family purposes in the ordinary and common acceptation of that term. It was in proof that on two or three occasions a few of the pieces of plate bought by the first Mrs. Fillmore were employed at public receptions as ornaments to decorate the table and rooms of the house; but the evidence wholly negatives the idea that they were used for family purposes generally. So, also, the wines acquired by Mr. Fillmore while he was president, and which were associated with Commodore Perry's expedition to Japan, were never used for family, or, indeed, for any other purpose, so far as appears. It is to be inferred that they were acquired by him as a gift, or present, from some officer of the Japanese expedition, and whatever might have been his intention as to their ultimate disposition, it is quite certain that he never intended them for ordinary or extraordinary family purposes, for it affirmatively appears that they were never so used during or after his lifetime. Whenever the family had occasion for the use of such wines they were invariably purchased for the purpose. The other articles mentioned are too trivial in value to merit particular notice, and it is enough to say that trunks bought and used by Mr. Fillmore for his individual use, and property which had for a long time been excluded from the house as an incumbrance and obstruction, were not within the meaning of the language of the contract.

We are, therefore, of the opinion that the judgments of the courts below should be reversed and a new trial ordered, with costs to abide the event.

All concur.

Judgment reversed.